THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. MARK S. HOLLEY, DEFENDANT-APPELLANT.

Argued December 20, 1960—Decided January 10, 1961.

[redacted]

*Mr. Brendan T. Byrne,* County Prosecutor of Essex County, argued the cause for plaintiff-respondent (*Mr. C. William Caruso,* Special Legal Assistant Prosecutor, of counsel and on the brief).

*Mr. Sam Weiss* argued the cause for defendant-appellant (*Mr. Julius Fielo,* attorney).

The opinion of the court was delivered by

FRANCIS, J.   Defendant Mark S. Holley was convicted of murder in the first degree and upon the recommendation of the jury was sentenced to life imprisonment. He appeals directly to this court as of right, *R. R.* 1:2–1(*c*), alleging as ground for reversal error in the admission of evidence at the trial.

It appears without dispute that on October 25, 1959, at about 10:30 A. M., at 50 Richmond Street, Newark, defendant shot and killed Samuel Baker. The State contended at the trial of the indictment arising therefrom that the killing was willful, deliberate and premeditated and so constituted murder in the first degree.

The State proved that in the early morning of October 25, 1959 Holley sold Baker a wrist watch for $2.00. Baker was a helper on the truck of the neighborhood ice dealer. Holley knew him casually and the sale arose through a chance meeting on the street. Very shortly thereafter, Baker discovered that the watch was not in working condition and he returned

to the site of the purchase where he looked unsuccessfully for the seller. A few hours later, just prior to 10:30 A. M., while engaged in his work on the ice truck Baker saw Holley in the vicinity of 50 Richmond Street where he (Holley) lived with his wife and seven children. Baker called to him and started toward him apparently to reclaim the purchase price and to return the watch. Holley ran to 50 Richmond Street and entered the building.

50 Richmond Street is a three-story apartment house. Upon entering the premises Holley went to the third floor where he lived, took a 12-gauge shotgun from under his bed, loaded it, went into the hallway and took a position at the top of the stairway. Baker, who had reached the second floor by that time, started up the stairs. He had mounted two steps when Holley (according to his statement to the police) pointed the shotgun and told him to go away. Baker allegedly said: "Come on down, I'm gonna kill you." Thereupon Holley fired the fatal shot.

The homicide took place at about 10:30 A. M. The police appeared on the scene in about 20 minutes and found the body at the foot of the stairway. A search located the gun and the expended shell. Pictures were taken of the deceased and the stairway and immediate area, both before and after the body was removed. Thereafter, until about 2 P. M., various police officers and detectives were at the scene investigating the matter. No weapon of any kind, other than the shotgun, was discovered on the stairway or landings, or in the hallway.

In the evening of the same day the police returned to the premises in response to a telephone call from Willie Frank Jordan, a relative by marriage of the decedent or his wife. On arrival, Jordan pointed out to them an ice pick on the third step of the stairway leading from the second to the third floor (according to the officers) or "right at the second floor landing" (according to Jordan). Jordan said that defendant's wife had pointed it out to him as they were descending the stairs and he then called the police. The pick was

taken to the police precinct. This was about 11 hours after the shooting.

The following day Holley gave the detectives a signed statement about the killing, which was admitted in evidence. It contains no assertion that decedent had an ice pick in his hand at the time of the shooting. These detectives were cross-examined vigorously as to whether defendant had not told them Baker was carrying an ice pick in his right hand when shot.

The State was aware from the post-event ice pick incident and from pretrial maneuvers that Holley would claim self-defense at the trial. And in fact, when defense counsel opened to the jury, he announced that he would prove that, after threatening Holley, Baker had started up the stairs toward him with an ice pick in his hand.

As the State's case unfolded, the various police officer and detective witnesses, who were first on the scene of the crime and who were called to the stand prior to Jordan, were examined without objection by both the prosecutor and defense counsel about the ice pick, the asserted failure of the police to find it, and the thoroughness of their search at the place where the body was found. Decedent's employer also appeared as a State's witness prior to Jordan. He testified that when Baker left the ice truck to go after Holley he did not have an ice pick with him. Obviously both parties were aware of the potency of the pick as a factor in defendant's claim of self-defense. It was equally obvious from the interrogations. both direct and cross, that the State in anticipation of the claim of self-defense (which had been asserted in counsel's opening to the jury) was endeavoring to establish that if decedent had been in possession of an ice pick it would have been found near the body, and that the defense was endeavoring to suggest or to give the impression that if the police search had been thorough the pick would have been discovered.

All of the witnesses who furnished the evidence detailed above, with the exception of the officer who received the tele-

phone call from Jordan and who in response thereto went to 50 Richmond Street, and those who testified about defendant's statement the day following the shooting, preceded Jordan to the witness stand. Thus the order of the State's proof shows that the course being pursued was establishment of the chronological sequence of events leading up to the bringing of the ice pick to the attention of the police.

When Jordan was called to testify, the criminal incident in its totality was being developed in its natural sequence. The State had the pick in its possession, the defense knew it, and the State undoubtedly felt obliged, not without reason, to produce it, explain the circumstances under which, and the time when, it made its appearance in the case and, in anticipation of the defense based upon it, to create the inference that someone favorable to the defendant's cause had placed it on the stairway after the event. After Jordan had been sworn and a few preliminary questions put to him, he was asked by the Assistant Prosecutor whether he had ever been convicted of crime. The prompt objection of defense counsel was overruled and the witness admitted that he had been convicted and that the crime was murder. The examination then proceeded and the State established the part Jordan played in the bringing of the ice pick to the attention of the authorities about 11 hours after the homicide.

Defendant urges as the only ground of appeal that it was error for the trial court to permit Jordan's conviction to be shown and that the error was of such magnitude as to require a new trial.

The law is settled in this jurisdiction that either party on producing a person as a witness may inquire on direct examination if he has been convicted of crime, and show the crime even if an affirmative answer is given. *State v. Costa,* 11 *N. J.* 239 (1953); *State v. Fox,* 12 *N. J. Super.* 132 (*App. Div.* 1951); *N. J. S. 2A*:81–12. In *Fox* the reason given for sanctioning the practice was that since the State, like any other party, in presenting a witness impliedly represents that he is worthy of some credit, it is proper to

bring out the fact that he has been convicted of crime to aid the jury in evaluating his testimony. An additional reason was advanced by this Court in *Costa,* namely, that such proof protects the State against the inference that vital information bearing upon the witness' credibility was withheld from the jury. 11 *N. J.,* at *p.* 249. It is true that some misgivings have been expressed over the years by courts and commentators as to whether in most instances the practice of proving prior conviction of crime of a party or a witness serves the cause of justice. Various qualifications have been suggested. See *Rule 21, Report of Supreme Court Committee on Revising of the Law of Evidence* (1955); *Rule 21, Report of Legislative Commission to Study the Improvement of the Law of Evidence* (1956); 3 *Wigmore, Evidence,* §§ 896–918 (*3d ed.* 1940); *McCormick, Evidence,* § 38 (1954). Nevertheless, the rule has survived in this and in most states.

But defendant contends that even assuming admissibility of a prior criminal conviction, the witness' principal testimony must concern the basic issue being tried between the parties and must be relevant and competent with respect to that issue; he must be put on the stand to prove some material fact in the State's case against the defendant. Holley attempts to liken the situation here to that which prevailed in *State v. Costa, supra,* but the cases are not at all comparable. In *Costa* the defendant was indicted for maintaining a gambling house at a specified location. At his trial, the State produced five persons as witnesses in its case and proved through each one the *single fact* that he (the witness) had pleaded *non vult* to an indictment charging the very same offense. The theory seemed to be that in some way their conviction had probative force toward the establishment of defendant's guilt. After summarily rejecting that claim, the Supreme Court pointed out that the proof could not even be considered as admissible with respect to the credibility of those persons because no independent relevant or competent evidence as to the fact of the defendant's

guilt of the crime charged was attempted to be offered or introduced through them. Therefore, the only purpose the State could hope to achieve by the proof of their conviction was to influence the jury into concluding that if these men had admitted conducting a gambling operation at the place owned by Costa at or about the period covered by the indictment against him, then he too must be guilty. The court declared unequivocally that the witnesses' admissions of guilt as well as the indictments themselves (which were also put in evidence) were not competent for that purpose.

The context is entirely different here. In view of the investigation by the State, the pretrial knowledge that defendant would plead self-defense based largely upon the ice pick, which fact was confirmed by defense counsel's opening, and by direct and cross-examination of the police officers who preceded Jordan on the witness stand, the State could properly anticipate the defense by showing that the pick was not at the scene immediately after the shooting and (through Jordan) that it did not appear in the case until some 11 hours later. That proof was competent also to create the inference that the pick was "planted" on the stairway after the crime by someone interested in aiding defendant's cause. Moreover, the State knew from the opening that Holley intended to testify not only that decedent was on the way to attack him with the ice pick when he fired the fatal shot but also that he would assert he told the police about the pick when the statement was taken from him. The assistant prosecutor conducting the trial was aware that the authorities had possession of the ice pick; if he did not reveal it and the circumstances of its appearance as part of the State's main case, he would be open to defense counsel's charge of concealment of evidence until forced to introduce it by the defense testimony. Thus, the concatenation of circumstances, *i. e.,* the possession of the ice pick and the nature of the defense, made advisable, as well as proper, the production of Jordan as a witness. Once that course was warranted, the principle of *State v. Fox* became applicable

and the State was justified in eliciting his previous conviction of crime to aid the jury in the evaluation of his credibility.

Accordingly, the judgment of conviction is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL and HANEMAN—6.

*For reversal*—None.