Application of Mark S. HOLLEY, for a Writ of Habeas Corpus.

Civ. No. 442-62.

United States District Court
D. New Jersey.

June 12, 1962.

@~251

---

LANE, District Judge.

Petitioner is presently confined in the New Jersey State Prison at Trenton, New Jersey, owing to his conviction of first degree murder in the Essex County Court on April 8, 1960. On January 10, 1961, the Supreme Court of New Jersey affirmed Mark S. Holley's conviction. State v. Holley, 34 N.J. 9, 166 A.2d 758 (1961). Certiorari to the Supreme Court of the United States was applied for and denied. 368 U.S. 854, 82 S.Ct. 89, 7 L.Ed.2d 51 (1961). Petitioner has now brought before this court an application for a writ of habeas corpus.

Samuel Baker was shot and killed at 50 Richmond Street, Newark, New Jersey, about 10:30 a. m., on October 25, 1959. His death occurred on the steps leading to the third floor of a three-story apartment house. Approximately twenty minutes after the homicide the police arrived. They thereupon conducted a thorough search of the premises. The only weapon found was a shotgun. The police returned later that evening, however, because of a phone call from Willie Frank Jordan, a relative of the decedent. Jordan showed them an ice pick on the steps leading to the third floor. Holley's wife, according to Jordan, had spotted the ice pick when she and Jordan were walking down the stairs. Jordan stated that upon seeing the pick, he had called the police.

One of petitioner's defenses at trial was justifiable homicide. Allegedly, Baker had started up the stairs toward him with an ice pick in his hand, hence there was an assault, Holley contended, which placed him in imminent peril of death or great bodily harm. Petitioner asserted that in this instance the law impliedly authorized him to kill his attacker through the lawful self-defense of using his shotgun. For discussion of innocent homicide see Perkins on Criminal Law, 28–29 (1957 Ed.).

It seems that the State had anticipated this defense at trial. Therefore, the assistant prosecutor called Willie Frank Jordan to the stand. After Jordan was sworn in, the following direct examination transpired:

"Q Mr. Jordan, where do you live? A 32 West Kinney, Newark.

"Q With whom do you live at that address? A Sir?

"Q Whom do you live there with, or do you live there alone? A Me and my wife Cora Lee Jordan.

"Q You live there with your wife? A Yes, sir.

"Q How long have you lived there? A Just about two years.

"Q Just about two years. Have you ever been convicted of a crime?

"MR. FIELO: Oh, object to that, if the Court please.

"MR. McKEOWN: State v. Fox [12 N.J.Super. 132, 79 A.2d 76], if the Court please.

"THE COURT: I will allow it.

"Q Have you ever been convicted of a crime? A Yes, sir.

"Q What was the crime? What was the crime?

"THE WITNESS: Do I have to answer, Judge?

"THE COURT: Yes, you will have to answer.

"A It was murder, sir.

*    *    *    *    *    *

"Q When you got down to the second-floor landing what occurred there? A Well, Mrs. Holley showed me an ice pick was laying there.

"Q Mrs. Holley showed you an ice pick? A That's right.

"Q And that was on the second-floor landing? A Right at the second-floor landing."

When the judge was delivering his charge to the jury, among other things, he stated:

"Now, during the course of this trial one Willie Frank Jordan testified as a witness and during the course of his testimony it was revealed that heretofore Jordan had been convicted of a crime. Upon the subject of credibility of a witness, it is the law of our State that no person offered as a witness in the course of a trial shall be excluded from testifying by reason of his having been convicted of a crime; but that evidence of such a conviction may be considered by the jury for such effect it may have upon the credit of such person as a witness. Therefore, in determining whether or not you believe the testimony of the witness Willie Frank Jordan, or what weight or credit you shall in your judgment accord to his testimony given during the course of this trial, you may take into consideration the admitted fact that prior hereto he was convicted of a crime."

Petitioner Holley's argument, couched in general and vague language, is:

" * * * [He] was denied a fair and impartial trial due to the cumulative effect of the admission of certain highly prejudicial evidence and the manner in which the said evidence was presented offended a sense of justice and thus the proceedings [were] fundamentally unfair; that the learned trial judge by quashing a subpoena duces tecum—being one of the basic rights of an accused under our system of jurisprudence and being so essential as to include, as a minimum, the right to such process; and, that the practice and mode followed by the State court, was so clearly at variance with the procedure constituting 'due process of law' under the 14th Amendment that the judgment must be completely invalidated."

28 U.S.C.A. § 2254 requires as a matter of national policy that affirmative relief be withheld from a state prisoner when this court exercises its power to entertain and dispose of petitions of habeas corpus until he has exhausted the remedies available in the state courts. The dual system of government in the United States requires that the State has the first opportunity to decide such issues when persons under the State's process raise them. Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953); Darr v. Burford, 339 U.S. 200, 70 S.Ct. 587, 94 L.Ed. 761 (1950).

In denying Holley's appeal for reversal of the trial court's conviction, the New Jersey Supreme Court said:

"Defendant urges as the only ground of appeal that it was error for the trial court to permit Jordan's conviction to be shown and that the error was of such magnitude as to require a new trial." 34 N.J. 10, 13, 166 A.2d 758, 760, cert. denied 368 U.S. 854, 82 S.Ct. 89, 7 L.Ed.2d 51 (1961).

Hence, the issue that the New Jersey Supreme Court decided was whether the admission of the evidence demonstrating Jordan had a prior conviction was reversible error. Accordingly, the only question before this court is whether the admission of this evidence infringed Holley's due process guarantee in the Fourteenth Amendment of the Constitution. He has failed to exhaust his state remedies on his other arguments.[1]

The common law forbids a party to impeach his own witness. McCormick on Evidence, § 38, p. 70 (1954). Generally, upholders of this position have

---

1. Relator Holley has open to him further avenues of relief in the state courts, by way of a New Jersey habeas corpus proceeding, on the other points he has attempted to raise before this court. See N.J.S.A. 2A:67-1 et seq.

claimed that the aggregate of three rationales reflects why we should maintain the rule.

The first rationale is that a party should be morally bound by his witness' statements. In repudiating this notion, it is stated in 3 Wigmore on Evidence, § 897, p. 385 (3d Ed. 1940):

"1826, 1934, Putnam J., in Brown v. Bellows 3 [4] Pick. [179], 187, 194 and Whitaker v. Salisbury, 15 Id. [534] 545: 'A party is not obliged to receive as unimpeached truth everything which a witness called by him may swear to. If his witness has been false or mistaken in his testimony, he may prove the truth by others.'

" '* * * It would evidently be a rule that would operate with great injustice, that a party calling a witness should be bound by the fact which was sworn to. No one would contend for a rule so inexpedient.' "

The second rationale is that a party should guarantee his witness' general credibility. In criticizing this, Wigmore asserts:

"Another and more satisfactory answer would be that the ends of truth are not to be subserved by binding the parties with guarantees and vouchings, and that it is the business of a court of justice, in mere self-respect, to seek all sources of correct information, whatever foolish guarantees a party may or may not have chosen to make." Id. at § 898, p. 386.

The third rationale is that a party ought not to have the means to coerce his witness. As to this, Wigmore comments:

"Taking this subjective point of view, we find that there is something of a reason,—a reason easy to grasp; founded on reality, not on cant; legitimate in its policy, orthodox in its history, though narrow in its scope,—the reason that *the party ought not to have the means to coerce his* witnesses. * * *

* * * * * *

"The true foundation of policy (so far as there is any) is here manifest. If it were permissible, and therefore common, to impeach the character of one's witness whose testimony had been disappointing, no witness would care to risk the abuse of his character which might then be launched at him by the disappointed party." Id. at § 899, p. 388.

Wigmore submits that the possibility of a witness being coerced by a party is the only reason which allows the details of the rule against impeachment of one's own witness to work out. Id. at § 899, p. 389. Yet in reflecting about this, the great commentator says:

"But, after all, it is a reason of trifling practical weight. It cannot appreciably affect an honest and reputable witness. The only person whom it could really concern is the disreputable and shifty witness; and what good reason is there why he should not be exposed? That he would adhere to false testimony solely for fear of exposure by the party calling him is unlikely; because his reputation would in that case equally be used against him by the opponent. It therefore becomes merely a question which of the two parties may properly expose him. Is there any reason of moral fairness which forbids this to a party calling him? The rational answer must be in the negative."

And finally, Wigmore proclaims:

" * * * The general rule itself (against impeaching one's own witness) is so fraught with irrationality that to apply it with rational deduction is almost impossible. A rule which rests upon a fiction is apt to lead to mere quibbles when a detailed and consistent development is attempted. The quiddities and meaningless distinctions which occur in the present application serve more than anything else to exhibit the arbitrary absurdity of the rule at large." Id. at § 909, p. 420.

Thus, we see that substantial criticism may be directed at the position of barring a party from impeaching his own witness.

N.J.S.A. 2A:81–12, entitled Interest or Conviction of Crime as Affecting Credibility, states:

"For the purpose of affecting the credibility of any witness, his interest in the result of the action, proceeding or matter or his conviction of any crime may be shown by examination or otherwise, and his answers may be contradicted by other evidence. Conviction of crime may be proved by the production of the record thereof, but no conviction of an offender shall be received in evidence against him in a civil action to prove the truth of the facts upon which the conviction was based."

It must be noted that the aforesaid New Jersey statute fails to state any qualifications as to the use thereof. For example, one is unable to find any words suggesting that the legislature thought it would be improper under all circumstances for a party to impeach his own witness.

Moreover, in State v. Fox, 12 N.J. Super. 132, 139, 79 A.2d 76, 80 (App.Div. 1951), Judge Bigelow declared:

"\* \* \* The State—like any other party—by presenting a witness, impliedly represents to the court that he is worthy of some credit. Carluccio v. Winter, 108 N.J. Eq. 174, 154 A. 427 (E. & A. 1931). It is therefore proper, when the State must rely on the evidence of the criminal, for the prosecutor, at the beginning of the examination, to bring out the fact that the witness has been convicted of crime, since the fact may aid the jury in weighing his testimony."

That New Jersey law, in some situations, permits either party to question his own witness as to whether he has ever been convicted of a crime was made clear in State v. Costa, 11 N.J. 239, 94 A.2d 303 (1953) by the New Jersey Supreme Court. There, the court stated, using Fox as authority:

"\* \* \* it [legal impeachment by the State of its own witnesses] protects the State against the inference that vital information [on credibility] was withheld from the jury, which inference we suppose may be made if the facts are first developed on cross-examination of the State's witnesses." Id. 11 N.J. at 249, and Id. 94 A.2d at 308.

This court concludes, after examination of the entire record, that the State of New Jersey has not denied petitioner the due process of law required of the State under the Fourteenth Amendment. No hardship so acute and shocking occurred, when the State elicited from its own witness his previous conviction of a crime, that our policy will not endure it. It did not violate those fundamental principles of liberty and justice which be at the base of all our civil and political institutions. Rather, in fact, since the State knew defendant Holley would claim self-defense, it was incumbent upon the State to explain its possession of the ice pick. The State, from their prior conversations with Jordan, could reasonably anticipate he would testify that defendant's wife had pointed the ice pick out to him. Taking into account that the police had made a search of the premises without locating the weapon, the assistant prosecutor was justified in questioning Willie Frank Jordan's veracity. Consequently, his attack of the witness Jordan's credibility on direct examination was logical and valid.

As in all cases involving what is or is not due process, so in this case, no hard and fast rule can be laid down. The pattern of due process is picked out of the facts and circumstances of each case. See Brock v. North Carolina, 344 U.S. 424, 427, 73 S.Ct. 349, 97 L.Ed. 456 (1953). The court's function here is limited solely to deciding whether the allowance of the impeachment testimony was so unreasonable as to deprive petitioner of the fundamental justice safe-

guard found in due process. Our system of federalism demands that we strike a balance between national and state authority. It would be highly capricious for us, a federal court, to rule that the State's impeachment of its own witnesses, as permitted under New Jersey law, in view of the circumstances presented, was arbitrary.

Accordingly, the petition for writ of habeas corpus is dismissed.