**U.S. ex rel. Edward 25X KING, Petitioner,**

v.

**Gary J. HILTON, Respondent.**

**Civ. No. 77–1126.**

United States District Court, New Jersey.

Feb. 22, 1979.[1]

---

1. This memorandum, not earlier cleared for publication, is now released because of its potentially useful gathering of materials dealing with the impeachment, on direct, of the prosecution's own witness in an area more commonly encountered than the one recently dealt with in *United States v. Edwards,* 631 F.2d 1049 (CA 2, 1980).

John G. Graham by Nusha Wyner, Morristown, for petitioner.

John J. Degnan, Atty. Gen. of New Jersey, Benjamin D. Leibowitz, Sp. Asst. Atty. Gen. (Trenton) by Donald S. Coburn, Essex County Prosecutor Newark N.J., for respondent.

## MEMORANDUM

BIUNNO, District Judge.

Edward 25X King was convicted in Superior Court of New Jersey, Essex County, on four counts of a six–count indictment for armed robbery, and sentenced to an aggregate of 8 to 12 years in State Prison. After affirmance of his conviction by the Appellate Division and the denial of certification by the Supreme Court of New Jersey, King filed a petition under 28 U.S.C. § 2254 in this court. Counsel was appointed, and because of decisions lately handed down at the time from higher courts, defendant was directed to file a special answer providing a chronological history. This method is an experimental one designed to adduce facts more efficiently when one of the parties is a pro se indigent in custody, and the other is his custodian. See, e. g., *U.S. ex rel. Ricketts v. Lightcap,* 567 F.2d 1226 (CA–3, 1977); *Hardwick v. Ault,* 517 F.2d 295 (CA–5, 1975).

King was later convicted, also in the Superior Court of New Jersey, on a later indictment charging possession of a revolver without a permit. As in the first case, his conviction was affirmed on appeal and certification was denied.

After the special answer had been filed in the pending § 2254 case, King submitted a second petition to challenge the second conviction. Since the rules on § 2254 relief enacted by Congress to take effect February 1, 1977 clearly intend that there be a single petition to challenge multiple judgments of the same state court, an order was entered directing that the second petition be treated as an amendment to the first petition.

In due course, answer to the second petition was filed. Thereafter, copies of briefs filed in the direct appeals, as well as opinions of the Appellate Division, papers on the applications for certification and the like, were received. Briefs on the petitions have also been received.

After careful review of the petitions and papers in both cases, the court finds only one issue of substance, that issue being one involved in the armed robbery conviction. That issue will be dealt with first. The others are without merit, and will be discussed afterwards.

### CALLING OF THE CO–DEFENDANT THOMPSON AND RELATED ASPECTS.

On September 10, 1973, King was indicted by an Essex County Grand Jury, along with Steven Lewis, Leroy Thompson and Clarence Jenkins, on six counts. The counts are in pairs, one charging robbery

(N.J.S. 2A:141–1) and the other charging possession of pistols during the robbery (N.J.S. 2A:151–5) for each of three victims: Betty Dupont, William Clark and John Taylor.

The alleged robbery evidently took place at the Tremont Hotel in Newark, the victims being the desk clerk (Dupont) and two persons in the lobby (Clark and Taylor).

King's trial took place from February 25 to March 1, 1974 and ended in mistrial when the jury could not agree. Trial before another jury took place April 23–25, 1974. At this trial, the court dismissed the two counts involving Clark. The jury returned verdicts of guilty on the remaining four counts (Dupont and Taylor). The sentences aggregated 8 to 12 years in State Prison.

Before the first trial, co–defendant Thompson pleaded guilty to the robbery of Dupont and was sentenced. At King's first trial, Thompson refused to testify, and was found to be in contempt of court.

At King's second trial, Thompson was again called as a witness for the State. This time, he was first examined on voir dire outside the jury's presence and informed the court that he would refuse to testify. In the jury's presence, and over objection, he was called to the stand by the State and sworn. In answer to questions he admitted that he had pleaded guilty to robbery of Dupont on May 29, 1973 (as charged in the indictment) but refused to answer questions about who else was involved in that robbery. He was then excused.

A motion for mistrial was denied, and the court gave the jury a cautionary mid–term instruction to the effect that Thompson's guilty plea was not to be considered as indicating that King was in any way guilty of the crime. Reference was made to the presumption of innocence, on which the court said it would charge more completely later. Finally, the court said that the jury was not to hold against King the fact that Thompson was named as a co–defendant in the indictment, nor was it to hold against King anything said about the conviction of Thompson while in the courtroom.

During summation, the prosecutor referred to Thompson's guilty plea and to identification testimony by the victim Taylor who had selected a photograph of Thompson, as indicating Taylor's opportunity to observe and ability to identify. Again, a cautionary instruction was given, to the effect that any involvement of others was "absolutely immaterial" to the issue of King's guilt.

Petitioner's brief on this score involves several aspects: (1) deprivation of a fair trial by allowing Thompson to be called, knowing he would not testify; (2) deprivation of a fair trial by the reference to Thompson's plea in summation, and (3) denial of the right of confrontation by calling a witness who it was known would refuse to testify.

The State's position is that while an accused on trial is entitled to have the issue of guilt decided on the evidence adduced against him at his own trial, and not by what occurred on prosecution of others, evidence of guilty pleas and convictions of co–defendants is not reversible error if there is no "undue emphasis" and if cautionary instructions are given, citing *U.S. v. Newman*, 490 F.2d 139, at 143 (CA–3, 1974), a case where reference to a co–defendant's conviction was mentioned by a witness during cross–examination although cautioned not to refer to it. [In *Newman*, where the reference had "crept in", the Court of Appeals found the cautionary instruction inadequate].

The State also relies on the proposition, taken from *State v. Jamison*, 64 N.J. 363, at 378–379, 316 A.2d 439 (1974) that since Thompson never claimed his Fifth Amendment privilege against self–incrimination but merely stated that he would not testify, the prosecutor had reason to hope that he would answer questions on the stand.

This argument is not persuasive. *Jamison* was a case where, during a recess in the jury selection for the trial of A for a stabbing, an accomplice, B, informed the prosecutor (who then informed the court) that it was he, not A, who had stabbed the victim. On voir dire before the judge, he admitted

the stabbing and exculpated A, thus contradicting an earlier statement to the police in which he inculpated A. Because of the seriousness of the admission, the judge appointed counsel for the witness, and counsel informed the court that the new testimony was withdrawn and that B would claim his Fifth Amendment privilege. The Supreme Court ruled that the judge's intervention was not warranted and probably deprived A of B's exculpatory testimony, albeit its credibility was open to challenge because of his first inculpatory statement.

In footnote 1, at pp. 373–374 of 64 N.J., 316 A.2d 439, reference is made to the practice, when the State calls an accomplice or co–participant, of conducting a voir dire examination first to avoid having the jury draw unfavorable inferences against defendant, and the rule under which the State can be precluded from calling the witness before the jury when he declines to testify on the voir dire. The policy considerations for that practice and rule are noted as not applicable in the reverse situation, when the defense wishes to call the witness, though no final articulation is made.

In any event, *Jamison* is not applicable because it presented the reverse situation, one where the defense wished to call the witness, not where the prosecution did.

■ Argument based on Thompson's failure formally to claim the Fifth Amendment is misplaced. First of all, these are not the McCarthy days during which a witness who did not pronounce the exact abracadabra was in jeopardy of being held to have waived the privilege. In the second place, Thompson could not raise a valid Fifth Amendment claim about the robbery of Dupont. He had pleaded guilty to that very charge, on the same indictment, and had been sentenced. Whatever Thompson was asked about the Dupont robbery, his answers could not amount to self–incrimination on that offense. His only risks were if he lied, in which case he could be charged with perjury or false swearing, for which the law gives no license, or if he refused to answer after being ordered to do so, in which case he could be punished for contempt or subjected to coercion as a recalcitrant witness. Cf. 18 U.S.C. § 6002, and 28 U.S.C. § 1826.

To put this case in its proper context, a number of aspects must be considered,

*One*: under New Jersey law, the fact that a witness has been convicted of a crime is one of the matters that may be shown for the purpose of affecting his credibility. See N.J.S. 2A:81–12 [but note that the final phrase, "but no conviction of an offender . . . upon which the conviction was based", is superceded by reason of the "Official Note" to N.J.Ev.Rule 60(20), dealing with a hearsay exception in civil proceedings]. With some variations by limitation, Fed.Ev. Rule 609 is essentially the same.

*Two*: it has long been common practice in both State and Federal courts, to allow the party who has called a witness to elicit on direct examination of his own witness any prior conviction of the witness. This is on the theory that the fact will be elicited anyway on cross–examination, and to allow it to be elicited on direct helps to neutralize any "sting" effect that might wrongly give the jury the impression that the party who called him was trying to foist an unreliable witness on them.

For cases dealing with the New Jersey practice before adoption of N.J.Ev.Rule 20, see *State v. Holley*, 34 N.J. 9, 166 A.2d 758 (1961), cert. den. 368 U.S. 854, 82 S.Ct. 89, 7 L.Ed.2d 51; *State v. Laws*, 50 N.J. 159, 233 A.2d 633 (1967).

For federal cases reflecting the practice before the enactment of Fed.Ev.Rules 607 and 609, see *Application of Holley*, 205 F.Supp. 933 (D–N.J., 1962); *U.S. v. Freeman*, 302 F.2d 347(CA–2, 1962); *U.S. v. Chamley*, 376 F.2d 57 (CA–7, 1967).

See, also, for a specific note on the practice of allowing the party calling a witness with a criminal record to elicit the record on direct examination, *Wigmore*, "Evidence", § 900, especially footnote 1 at p. 667.

Despite a dearth of treatment of the subject in primary and secondary authorities, the practice was already long established and widely recognized by the profession, bench and bar, 40 or more years ago. One

of the classic examples (unfortunately not a reported case) is *State v. Workman* (Essex County, N.J.), in which Charles (The Bug) Workman was tried for the murder of Arthur Flegenheimer (Dutch Schultz) at the Palace Chop House in Newark, on October 23, 1935. See *U.S. v. Flegenheimer*, 14 F.Supp. 584, at 592 (D–N.J.1935); ordered stricken from the records, 110 F.2d 379, at 381 (CA–3, 1936). Some five years later one Abe (Kid Twist) Reles provided information inculpating Workman as "the one who shot the Dutchman". At Workman's trial, Reles was the star witness for the prosecution. It was at the conclusion of his relevant, inculpatory testimony that Essex County Prosecutor (later Mr. Justice) Wachenfeld elicited on direct examination the list of prior convictions of the witness. This was then, and is today (from this court's observation) the widely accepted practice.

Any implication to the contrary that might be drawn from the passage in *State v. Fox*, 12 N.J.Super. 132, at 139, 79 A.2d 76 (App.1951), is misunderstood. The opinion in *Fox* was written by Judge John O. Bigelow, who had long experience as Essex County Prosecutor, was the predecessor of Hon. William A. Wachenfeld (who had been his assistant), and also served as Chairman of the Legislative Commission to Study the Improvement of the Law of Evidence (CO-SILE), established by N.J.J.R. 15, 1955. What Judge Bigelow referred to in *Fox* was the case of the *willing* witness for the prosecution. For that class of witness, the strategy was to elicit the prior convictions early in the direct examination. But, where confidence in the readiness of the witness to testify on the merits was not that strong, the practice was and still is to elicit the prior convictions at the end of the direct examination.

*Three* : Except for the special case where evidence of the commission of other crimes or civil wrongs may be received for the limited purpose of showing motive, intent, plan, knowledge, identity, or absence of mistake or accident as against the accused on trial, N.J.Ev.Rule 55; Fed.Ev.Rule 404(b), evidence of the prior conviction of a witness is limited to the question of his credibility as a witness.

*Four* : The common law rule that the party calling a witness "vouched" for him and thus could not impair his credibility had been eroded by decisions, court rules and statutes before the adoption of modern evidence rules. The federal formulation, Fed. Ev.Rule 607, simply states that the "credibility of a witness may be attacked by any party, including the party calling him."

The New Jersey formulation is more sophisticated, N.J.Ev.Rule 20. In the context of this case, the New Jersey formulation does not allow impeachment of one's own witness (a) except to neutralize his live testimony with his prior inconsistent statement [cf., Fed.Ev.Rule 801(d)(1)], and (b) only if it is found that the testimony "surprises" the party.

This point was one of the disagreements that delayed adoption of many of the New Jersey evidence rules from their promulgation in September, 1964 until they took effect September 11, 1967. In the pamphlet published by the N.J. Rules of Evidence Study Commission (Gann Law Books, 1968) the Commission articulated a "caution" to Rule 20, reflecting the original disagreement and its eventual resolution. It read as follows:

> "CAUTION: While the original proposal was broad enough to permit impeachment of one's own witness [as in Fed.Ev.Rule 607], the exception added in the final draft probably limits this to neutralization in cases of surprise. *There would be no point to an impeachment* (i. e., an attack on the witness' general reputation for truth and veracity) *for other purposes not permitted.* Query: There may be open questions in cases of witnesses who switch stories: (a) if the party is aware of the switch and so informs the court, may the witness be called as the court's witness; (b) in the same case, should the witness first testify without the jury–it may be that he will not switch." (Emphasis added)

Since these comments were by the Study Commission that conferred directly with the

Supreme Court to iron out and resolve differences [see *Preface* by Senator (now Congressman) Frank J. Guarini, Chairman of the Study Commission, in 1972 Edition, "New Jersey Rules of Evidence" (Gann Law Books) at pp. xvii and xviii], they deserve somewhat more than the weight that would be accorded to the traditional secondary authority.

The problem inherent in the New Jersey limitation to neutralization in cases of surprise was foreseen as one to be resolved by a preliminary voir dire under oath without the jury. If the witness then testifies, he may safely be called before the jury. If he does not, there is obviously no point in calling him before the jury merely to impeach him when he will not then testify on the merits.

In the context of the present case, it is beyond rational understanding why Thompson·was allowed to be called to testify when he had already refused to do so at the first trial, and again on voir dire at the second trial; especially over objection.

To take the circumstances of this case to its outer limits, it might have been permissible to call Thompson to testify, even after full awareness that he would likely refuse, if only in the hope he would change his mind, so long as the questioning were first restricted to the merits: where was he on May 29, 1973; was he in the lobby of the Tremont Hotel any time that day; if so, was anyone else with him; and so on. If he· refused to answer these questions on the merits, to test whether the distant hope might be realized, he could then be excused and an appropriate cautionary instruction given to the jury without "impeaching his credibility" when he had testified to nothing to be impeached. This also assumes that no reference would be made to the fact that Thompson had been named in the same indictment, and that the indictment itself would be edited (redacted) to remove his name before going in to the jury room.

Instead, having no more than a forlorn hope that Thompson would answer questions on the merits, the prosecution first brought out his prior conviction, on the same indictment, of the robbery of Dupont.

No matter how clear and emphatic the instructions could be, it is clear that nothing could effectively erase from the jury's mind the impressions that Thompson participated in the Dupont robbery and that he did not want to testify against his fellow participant, King.

That what occurred before the jury in the calling of Thompson was error is hardly open to dispute. The question is whether, on habeas corpus, it appears that the error so conspicuously prejudiced King as to deprive him of a fair trial or due process (which may be two ways of saying the same thing). See *Watson v. Yeager*, 458 F.2d 23·(CA-3, 1972). And federal law governs questions of error involving federal constitutional issues, with the burden placed on the beneficiary of the error to show beyond a reasonable doubt that the error was harmless, *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824,. 17 L.Ed.2d 705 (1967).

It must be kept in mind that the jury at King's first trial was unable to agree. The key issue was obviously identity. In the second trial, the calling of Thompson under the conditions described, and the comment in summation to the effect that the witness Taylor had selected Thompson's picture from a photo spread and that Thompson had pleaded guilty, amounted to an effort to persuade the jury that Taylor had correctly identified King.

Not only is this a case of *res inter alios acta* but it carries a strong flavor that because Thompson was guilty, King must be as well.

This is not a case like *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). There, defense counsel indicated that a co–defendant who had pleaded guilty but was awaiting sentence, would not testify. Despite this, the co–defendant's expected testimony was referred to in the opening, based on information from three other sources that the co–defendant would testify.

When the co–defendant was called, he informed the court that he intended to assert his privilege against self–incrimination and was dismissed from the stand. He was asked and he answered no questions about his own plea of guilty, nor was that fact put before the jury in any way.

Rather, this case is closer to *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). There, an accomplice who had been tried and convicted, and whose appeal was pending, was called by the prosecution. He claimed his 5th Amendment rights. He was declared to be a hostile witness and the prosecution was allowed to "cross–examine" (i. e., ask leading questions). He was read, as questions, a series of statements from his own confession and for each was asked if that refreshed his recollection. For each, he declined to answer. Three police officers were then called and each identified the document from which the prosecution had read as embodying the confession of the accomplice. The document was not received in evidence.

While not deciding whether the accomplice properly invoked the 5th Amendment, the court ruled that what took place was no "mere minor lapse", and that the adverse inferences from the accomplice's refusal to answer added critical weight to the prosecution's case in a form not subject to cross–examination, and thus unfairly prejudiced the defendant. In that case, for the first time, the Supreme Court applied the 6th Amendment right to confrontation to the States.

Confrontation rights are implicated in King's case as well, since Thompson testified to nothing on the merits, yet the adverse inferences from his testimony about his own conviction on the same robbery charge in the same indictment, could not be subjected to cross–examination.

See, also, the views of the Court of Appeals in a different context, of the effect of "overreaching" as a deprivation of due process of law, in *U.S. v. Twigg*, 588 F.2d 373 (CA–3, 1978).

For the reasons stated, the court concludes that a conditional writ should issue. The order thereon is to be prepared and submitted by defendant, and shall be conditioned upon the start of retrial of King within a stated time after entry, or after docketing here of mandate on affirmance or of a dismissal of the appeal in the event of an appeal, or after entry of any order or judgment of the Supreme Court denying review of, or having the effect of upholding the granting of the conditional writ.

The court has no information on which it can make a rational finding to set the date by which a retrial must begin. The defendant is in a much better position to do so since his attorneys have access to information about the location of witnesses and their availability. However, the time set is to be a reasonable one, chosen to permit retrial at the earliest feasible date.

*DENIAL OF A SECOND IDENTIFICATION HEARING.*

■ At King's first trial, a hearing was conducted on the question whether identification testimony was unpermissibly tainted, as required by *U.S. v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) and their progeny. The test is whether there is a showing of "a very substantial likelihood of irreparable misidentification", under all the circumstances of the particular case, *Simmons v. U.S.*, 390 U.S. 377, at 384, 88 S.Ct. 967 at 971, 19 L.Ed.2d 1247 (1968); *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). The court found the identification admissible according to that standard.

At the second trial, King requested that the hearing be conducted a second time and the request was denied.

The purpose of such a hearing is to enable the court to rule on the issue of admissibility. Only in the case of "confessions" has the Supreme Court ruled that the preliminary inquiry must be conducted outside the presence of the jury, *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

In situations not involving confessions, the question whether hearings on admissibility should be conducted outside the presence of the jury is one to be settled by the judge "when the interests of justice so require." *Fed.Ev.Rule* 104(c); *N.J.Ev.Rule* 8(1).

The note of the Advisory Committee in respect to this provision (which was in no way altered or commented upon in the Congressional committee reports), made the following observation about preliminary matters going to the admissibility of evidence other than confessions:

> "Otherwise, detailed treatment of when preliminary matters should be heard outside the hearing of the jury is not feasible. The procedure is time consuming. Not infrequently the same evidence which is relevant to the issue of establishment of fulfillment of a condition precedent to admissibility, is also relevant to weight or credibility, and time is saved by taking foundation proof in the presence of the jury. Much evidence on preliminary questions, though not relevant to jury issues, may be heard by the jury with no adverse effect. A great deal must be left to the discretion of the judge who will act as the interests of justice require."

To this note, the court adds its own observations from actual trials, comparing both methods. When there is a separate examination, without the jury, of an identification witness, there are several serious impediments created to a fair trial in the event the finding is that the evidence is admissible. One is that the eyewitness becomes tainted in the process in a fashion that unduly depreciates the value of the live testimony before the jury as a source of truth. This is because the defendant must be present at the separate preliminary hearing, and so is unavoidably seen alone and separately by the witness. It is asking too much of the ordinary witness, such as a teller or customer in a bank robbery, to make sophisticated distinctions before the jury on the question whether the identification is based on observation at the time of the event, or on observation of defendant at the preliminary hearing.

The second, and inherently insurmountable obstacle, is that during cross–examination before the jury, the witness can be asked questions that are not quite the same as those asked at the separate hearing, or, even if the questions be verbatim (with the support of a transcript), the answers of the witness (who has no transcript) will ordinarily be phrased differently. The witness is then confronted with the Q and A of the preliminary hearing on the ground of showing prior inconsistent statements going to credibility. This tactical misuse of the preliminary hearing serves only to confuse the witness and the jury, and deprives the testimony before the jury of freshness and candor. Evaluation by the jury is made more difficult.

Having observed these undesirable aspects, this court's practice generally is to conduct the preliminary hearing by a voir dire of the eyewitness in the presence of the jury before the identification testimony itself is allowed to be elicited. In some instances involving the legitimacy of line–ups or photo–spreads, a limited preliminary hearing without the jury is allowed, with the witnesses confined to those who conducted the line–up or presented the photo–spread, but excluding the eyewitness (who is segregated).

In sum, King had no constitutional right to a separate hearing on admissibility in the absence of the jury. This did not deprive him of the right to a voir dire on the issue before the jury. He had that opportunity.

Beyond that, such a separate hearing had already been conducted before the same judge at the first trial, and it is fundamental that in passing on preliminary questions going to admissibility, the court is not confined by the rules of evidence. See *Fed.Ev. Rule* 104(a), and *N.J.Ev.Rule* 8(1). Thus, at the second trial the judge could properly rule on admissibility on the basis of the separate hearing conducted in the first trial. This fact fortifies the correctness of the trial court's ruling since King had no absolute right to a hearing outside the jury's

presence at either the first or the second trial.

### EXCLUSION OF THE PROFFER OF THE BARONE TESTIMONY.

King had different trial attorneys in his two trials. At the second trial, a proffer was made of his first attorney, Barone, who had been present at the identification hearing conducted outside the jury's presence.

The purpose of calling Ms. Barone was to have her testify to allegedly inconsistent statements by identification witnesses at that hearing.

There is no doubt of the long–recognized rule that the credibility of a witness may be put in question by a showing of prior inconsistent statements. *Fed.Ev.Rule* 613, *N.J. Ev.Rules* 20 and 22.

But the trial court's rejection of the Barone testimony was based on the fact that there was a stenographic record of the prior testimony, which the court was ready to order transcribed on an expedited basis, an offer which King's attorney declined.

■■■ Where the alleged prior inconsistent statement is in the form of testimony taken on a stenographic record, the best evidence is a certified transcript of that record, *Fed.Ev.Rules* 1001, 1002; *N.J.Ev. Rule* 70. The evidence was that the stenographic record was available and could be quickly transcribed; it was not lost or destroyed so as to allow Ms. Barone's testimony to be received as secondary evidence, *Fed.Ev.Rule* 1004, *N.J.Ev.Rule* 70.

King was not deprived of an opportunity to question credibility by a showing of prior inconsistent statements. He was required to do so, if he could, by the best evidence available and chose not to do so. This is hardly error.

### HEARSAY TESTIMONY OF PORTELLA.

■■ The claim is that some hearsay testimony of Portella violated King's confrontation rights under the 6th Amendment. At the time of the testimony, the trial judge promptly instructed the jury to disregard it.

■■ There is no trial in which some answers to questions amount to inadmissible testimony. For such occurrances to rise to the level required for habeas corpus relief, considerably more must be shown. They are dealt with by appropriate mid–trial instructions. See *Bruton v. U.S.*, 391 U.S. 123, at 135, 88 S.Ct. 1620, at 1627, 20 L.Ed.2d 476 (1968). Defendant is entitled to a fair trial, but not to a perfect one. *Lutwak v. U.S.*, 344 U.S. 604, at 619, 73 S.Ct. 481, at 490, 97 L.Ed. 593 (1952).

### DENIAL OF MOTIONS FOR JUDGMENT OF ACQUITTAL AND NEW TRIAL.

■■ The denial of these motions did not reach constitutional levels. The function of a habeas court is the narrow one of evaluating the matter of due process. It does not extend to the scope of appellate review or of a broad exercise of supervisory power. *Donnelly v. De Christoforo*, 416 U.S. 637, at 642, 94 S.Ct. 1868 at 1871, 40 L.Ed.2d 431 (1974).

### DISMISSAL OF JUROR SELLERS.

This juror, who was black, was removed from the jury during trial following a voir dire stimulated by a report that a spectator at trial had approached and spoken to him.

Alternate jurors are employed so that they may be substituted for one or another who may be disqualified or otherwise unable to continue after the trial begins. The system was inaugurated in New Jersey as the result of the experience, in a 3–month trial of the Newark City Commissioners in a land fraud case when one of the jurors came down with acute appendicitis and a mistrial had to be declared. Retrial took another 3–months.

King's protest is based on the fact that the disqualified juror was black, and that when he was excused only one black remained on the jury; while the black population of Essex County is said to be 30%.

■■ Not only is a defendant not entitled, in a constitutional sense, to a jury that proportionately reflects a cross–section of the population (i. e., a stratified random sample), *Swain v. Alabama*, 380 U.S. 202, at 208, 85 S.Ct. 824, at 829, 13 L.Ed.2d 759

(1965), but he is not entitled to have remain on the jury a member whose qualification has been damaged by communication with third-parties, no matter what the juror's color, race, sex or other identifying characteristics may be. All the jurors, including alternates, are subject to the jury selection process and any 12 of them may decide the case.

## VIOLATION OF THE WITNESS SEGREGATION ORDER.

■ This claim rests on the fact of a discussion by Detective Portella with the prosecutor about the testimony of the witness DuPont. The trial court ruled there had been no violation of the order to segregate witnesses. Segregation orders involve no constitutional question. Whether the trial court's ruling was the same as the one this court might have made is irrelevant.

## AGGREGATE EFFECT.

Except for the ruling in regard to the witness Thompson, the court has considered the aggregate effect of the other alleged errors, and finds that, taken together, they fall far short of a showing that defendant was deprived of a fair trial on their account.

## SENTENCE

■ The claim here is that the trial court considered conduct of the defendant other than the offense of which he was convicted. Considering the dollar harvest of the robbery, taken alone, it could be argued that the combined 8 to 12 year sentence was a heavy one. But one element in the case is that the robbery was an armed robbery. This factor, by itself, is more than adequate to constitute a prime consideration in sentencing, and to conclude that protection of society from the dangers of defendant's conduct warrants his isolation by imprisonment for an extended period. The sentence was within the limits prescribed by law, and under the New Jersey practice defendant was allowed to challenge the sentence for excessiveness, *N.J. Court Rule*, R. 2:10–3, an opportunity beyond those called for by the Constitution.

## THE GUN POSSESSION CONVICTION.

This conviction, which was unrelated to and later than the armed robbery, resulted in a sentence of 1 to 2 years concurrent with the earlier 8 to 12 year sentence on the armed robbery charges discussed above. Sentence was imposed July 29, 1975, and ran out on July 28, 1977, assuming the full sentence had to be served. Actual service is said to have expired on February 23, 1977.

■ Whether one date or the other be used, the fact is that King's sentence on this conviction was fully served at the time he filed his petition here on August 10, 1977 (which the court directed be treated as an amendment to his earlier petition on the armed robbery charge).

Thus, when King filed he was not "in custody" under this sentence, which had expired, nor was it a sentence "to be served in the future". 28 U.S.C. § 2254, Rule 1 effective February 1, 1977. *Carafas v. La Vallee*, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968); *Craig v. Beto*, 458 F.2d 1131 (CA–5, 1972); *Hensley v. Municipal Court*, 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973). This aspect of the petition presented no question for this court at the time it was filed, and the (amendment to the) petition is accordingly denied.

Submit order accordingly.

## ADDENDUM:

The analysis in respect to the calling of the witness Thompson is buttressed by the fact that the implications and inferences arising from all the circumstances amounted to placing before the jury that which amounted to "connecting" or "linking" testimony on which King could not possibly cross-examine. See, *U.S. v. Belle*, 593 F.2d 487 (CA–3, 1979) (en banc).